## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 18-cr-30038 |
| ) | |
| JANHOI COLE, ) | |
| ) | |
| Defendant. ) | |

## **REPORT AND RECOMMENDATION**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Defendant Janhoi Cole's

Amended Motion to Suppress Evidence (d/e 24) (Motion).  On July 10,

2018, a grand jury indicted Cole for possession with intent to distribute 500

grams or more of a substance containing methamphetamine (Count 1), and

possession with intent to distribute 1 kilogram or more of a substance

containing heroin (Count 2), both in violation of 21 U.S.C. §§ 841(a)(1), and

(b)(1)(A).  Indictment (d/e 9).  On April 12, 2019, Cole filed the Motion to

suppress the evidence found as a result of a traffic stop in Springfield,

Illinois on June 25, 2018, and any statement or admissions obtained as a

result of that stop.

On May 28, 2019, the Court held an evidentiary hearing on the

Motion.  Cole appeared personally and by his attorney Daniel Noll.  The

Government appeared by Assistant United States Attorney Matthew Weir. At the close of the hearing, the Court took the matter under advisement and directed the parties to submit supplemental memoranda.  A transcript (T.) of that hearing was prepared and filed (d/e 26).  The briefing is now complete, and the matter is ready for this Court's Report and Recommendation.  For the reasons set forth below, this Court recommends that the Motion should be DENIED.

STATEMENT OF FACTS

On June 25, 2018, Morgan County, Illinois, Sheriff's Deputy Derek Suttles was patrolling on Interstate 72 (I-72) in Morgan County, Illinois, west of Springfield, Illinois.  Deputy Suttles was working criminal interdiction on I-72.  Deputy Suttles had nine years' experience as a Deputy in Morgan County.  For six of those years he worked criminal interdiction on the roadways.  Deputy Suttles also had training in criminal interdiction.  T. 15.

At 11:02 a.m., Deputy Suttles sent a message to the Illinois State Police Trooper Clayton Chapman that he was following a silver Volkswagen hatchback automobile traveling eastbound in I-72 (Vehicle). Deputy Suttles observed that the Vehicle was traveling at 50 to 55 miles per hour, well below the speed limit.  Deputy Suttles notified Trooper

Chapman because Trooper Chapman worked criminal interdiction patrol on I-72 and Interstate 55 (I-55) in Illinois State Police District 9 that included Morgan and Sangamon Counties, Illinois.  Deputy Suttles notified Trooper Chapman because the Vehicle was traveling east out of Morgan County, and so, out of Deputy Suttles's jurisdiction, and into Sangamon County, Illinois. Deputy Suttles had not observed the Vehicle commit any traffic violation.  He considered traveling at such a low speed sufficiently unusual to alert Trooper Chapman.  Transcript of Proceedings (d/e 26) (T.), at 6-11; Government Exhibit 1, In-Car Communications between Deputy Suttles and Trooper Chapman.

Trooper Chapman had 14 years' experience as an Illinois State Trooper.  He worked patrol in the Chicago, Illinois, area for the first five years and worked the remaining time in District 9.  T. 11-14,  17-18, 21. During his employment as a State Trooper, Chapman took approximately 250 hours of additional training, mostly related to interdiction of drug trafficking and other criminal activity on the highways.  T. 67.

Deputy Suttles told Trooper Chapman that Suttles did not have a basis to pull the Vehicle over.  Deputy Suttles told Trooper Chapman to take a look at it.  Deputy Suttles also checked the information on the license plate on his in-car computer.  Deputy Suttles sent that information

to Trooper Chapman by text message.  The license plate information showed that on June 4, 2018, the car was sold and registered to Cole with an address zip code in Los Angeles, California.  The odometer reading at the time of sale was 122,492 miles.  Trooper Chapman knew from his experience that Los Angeles was a known drug source location for marijuana, methamphetamine, heroin, and cocaine.  Trooper Chapman also knew from his training and experience that drug trafficking organizations re-register vehicles and trade vehicles so law enforcement cannot associate a vehicle with a particular individual.  The information indicated that the car was insured on June 21, 2018, just four days earlier. Trooper Chapman knew from his training and experience that drug traffickers purchase insurance for a specific trip rather than maintaining continuous insurance on the car.  T. 78-79.  The computer information indicated that the license plate was valid, and the car was insured. Trooper Chapman testified that the computer record about insurance was not reliable because the computer record would not indicate the effective date of the insurance.  T. 28-29, 68; Government Exhibit 1, In-Car Communications between Deputy Suttles and Trooper Chapman.

Deputy Suttles told Trooper Chapman that the rear cargo area of the hatchback Vehicle was covered.  Deputy Suttles testified that coverings

were commonly used by individuals involved in criminal activity.  Trooper

Chapman told Deputy Suttles that he would set up to take a look at the

Vehicle.  T. 12-13; <u>Government Exhibit 1</u>, <u>In-Car Communications between

Deputy Suttles and Trooper Chapman</u>.

Trooper Chapman moved his marked squad car into position on I-72

median in the City of Springfield, Sangamon County, Illinois, facing

eastbound traffic in order to observe the Vehicle.  Trooper Chapman had a

dash-mounted camera in his marked squad car. The camera was mounted

on the rear-view mirror in the center of the front windshield.  The camera

took both a panoramic and normal video of the view in front of the squad

car, and also took video of the interior of the squad car.  Cole submitted

into evidence the video recording of the events that occurred in front of the

squad car during the incident with the Vehicle on June 25, 2018.  Defense

Exhibit 2, <u>DVD Dash Cam Recording</u>.  The recording also included the

audio of Trooper Chapman, those communicating with him on the squad

car radio, and Cole when Cole was talking to Trooper Chapman.  T. 18-20.

Trooper Chapman waited to observe the Vehicle.  In his report,

Trooper Chapman indicated he knew Volkswagens to be used for drug

trafficking and to have aftermarket hidden compartments installed to hold

the drugs.  He had discussed this with Illinois State Police Sergeant Dustin

Weiss.  Sergeant Weiss was part of the State Police Statewide Criminal Patrol Team (Team).  The Team worked statewide criminal interdiction. Trooper Chapman also knew of another incident in which a drug trafficker used hidden compartments in Volkswagens to hold the drugs.  T. 40, 41, 59, 60.

When the Vehicle passed Trooper Chapman, the Vehicle was traveling well below the speed limit.  The Vehicle was not in a construction zone.  Trooper Chapman noticed that when the Vehicle passed his marked squad car, the driver had his arms fully extended and sat back as far as possible.  The driver seemed to hide behind the pillar between the driver's door and the passenger door in the Vehicle.  Based on his experience and training, Trooper Chapman considered this behavior to be suspicious and indicative of someone attempting to hide.  In January 2018, Trooper Chapman had taken a training course in evaluating how people react when they see a marked squad car.  Trooper Chapman began following the Vehicle. Trooper Chapman had decided to see if he could stop the Vehicle for a traffic violation.  T. 22, 26, 41-42.

The Court's recitation of the remaining facts below, including the quotations, is based primarily on the Court's review of the dash cam recording.  The Court cites to the Transcript when including additional

information from relevant testimony.  The Vehicle traveled eastbound on I-72 to the location in Springfield where I-72 merged with I-55.  As the two roads merge, the right lane of I-72 merges with the left lane of I-55.  Shortly after these two lanes merge, the left lane of I-72 ends.  The merger area was in a construction zone at the time.  The Vehicle was traveling in the right lane of I-72 at the merger point.  A vehicle in the left lane of I-72 (Merging Vehicle) moved in front of the Vehicle near the point where the left lane of I-72 ended.  Trooper Chapman concluded that the Vehicle thereafter followed too closely behind the Merging Vehicle.

The recording showed the squad car following the Vehicle before the Vehicle entered the area where I-72 and I-55 merged.  Trooper Chapman estimated that the Squad Car was behind the Vehicle by about the length of a football field.  The Vehicle was in the right lane of I-72 and the Squad Car was in the left lane.  A Black SUV was in the right lane of I-72 between the Squad Car and the Vehicle.  After the right lane of I-72 merged with the left lane of I-55, the markings in the left lane of I-72  indicated that the lane was ending soon.  The Merging Vehicle then moved to the right in front of the Vehicle as the Squad Car also merged to the right.  The video shows the Merging Vehicle moving in front of the Vehicle, but the camera's view of the Vehicle is momentarily blocked by the Black SUV as the Squad Car

merged into the right lane behind the Black SUV.  The Squad Car, however, moved back immediately into the left lane to view the Vehicle and the Merging Vehicle.  The recording at that point shows the Vehicle traveling closely behind the Merging Vehicle.

Trooper Chapman testified that he saw from the driver's seat that the Merging Vehicle merged in front of the Vehicle, although the camera mounted to his right in the center of the Squad Car did not record the merger as he saw it.  T. 37-39, 75.  Trooper Chapman said he observed that the Vehicle was two car lengths or less behind the Merging Vehicle.  T. 75-76.  Cole testified that he was much farther away from the Merging Vehicle when it merged in front of him.  T. 99-100.  As explained above, the recording shows that after the Squad Car swung back to the left from behind the Black SUV, the Vehicle was following closely behind the Merging Vehicle.  Based on the Court's observation of the recording, the Court credits Trooper Chapman's version of these events.  The Vehicle was following closely behind the Merging Vehicle.  Trooper Chapman turned on his lights and pulled over the Vehicle for the traffic violation of following too closely behind another vehicle.

The counter on the video shows that the Vehicle stopped at 1:32.[1]
After stopping the Vehicle, Trooper Chapman called in the plate number to
dispatch.  At 1:48, Dispatch confirmed the plate belonged to a 2010
Volkswagen that matched the description of the Vehicle.  Trooper walked
up to the front passenger window of the Vehicle and asked for Cole's
driver's license.  Cole produced an Arizona driver's license.  Trooper
Chapman testified that Cole appeared to be extremely nervous.  Trooper
Chapman said he could see a throbbing artery in Cole's neck.  He said
Cole was also breathing heavily.  Trooper Chapman testified that he saw
perspiration appear on Cole's neck and could see the pulse in Cole's
stomach.  Trooper Chapman said that in his experience, this type of
nervous reaction to being pulled over was consistent with the driver being
involved in criminal activity.  Trooper Chapman also observed numerous
drinks and snacks in the Vehicle's interior, indicating that the driver had
been traveling long distances at the time of the stop.  Trooper Chapman
also noticed that the only luggage in the Vehicle was a small backpack on
the rear seat.  Trooper Chapman believed the lack of luggage was not
consistent with a long-distance trip.  T. 43-44, 52-53, 96.

---

[1] Throughout, the Court refers to the time elapsed in the recording in the format "x:y," where "x" is the minutes elapsed in the recording and the "y" is the additional seconds elapsed in the recording.  In this instance, the Vehicle stopped at 1:32, or 1 minute  and 32 seconds into the recording.

Trooper Chapman asked Cole if the address on the license was his current address and if the Vehicle was his car. Trooper Chapman also asked for the registration of the Vehicle.[2]   Trooper Chapman asked Cole to come out of the Vehicle and come back and sit in the Squad Car with Trooper Chapman.  Trooper Chapman asked Cole to sit in the Squad Car because Trooper Chapman had a hard time hearing Cole due to the traffic noise.  Trooper Chapman testified that he also considered himself exposed to the traffic standing on the shoulder of the Interstate.  T. 31.  At 2:33, Cole exited the Vehicle and walked back to the Squad Car with Trooper Chapman.  Trooper Chapman briefly looked through the window into the hatchback area of the Vehicle before returning to the Squad Car.  Cole asked if Trooper Chapman could tell him why he got pulled over.  Trooper Chapman said he would tell him and told Cole to have a seat in the Squad Car.  Cole entered the Squad Car at 3:02.

Once in the Squad Car, Trooper Chapman told Cole he stopped him because he was following too closely behind the Merging Vehicle.  Cole said, "No bullshit, you got me nervous so I was wondering why."

---

[2] The audio portion of the recording at this point is garbled and difficult to discern.  The Court could not hear anything Cole stated while Trooper Chapman was standing outside the Vehicle talking to Cole.

Trooper Chapman asked Cole why he had an Arizona driver's license and a California license plate on the Vehicle.  Cole said he was a chef who worked in California, Maryland, and New York.  He said he worked in Arizona at one time.  He had renewed the license a year earlier.  He said he kept the license because of the expiration date.

Cole said he was headed to Maryland. He worked as a personal chef. He said he went to meet family in Colorado.  He said "hooked up" with friends and family in "the Springs" in Colorado.  Trooper Chapman asked Cole about the origin of his trip.  Cole said he went from Maryland to Cincinnati "for a couple of days, work related," and then stopped in Colorado, "at the Springs."  He said he "met some friends at the Springs." He said after that, he visited a friend outside of Boulder and came back. Trooper Chapman asked if he went from Maryland to Cincinnati to Colorado Springs.  Cole said, "Yes sir." Trooper Chapman repeated that Cole was returning to Maryland.  Cole said yes.  Cole said that the "hook up" was in Colorado.

Trooper Chapman asked Cole when he left on this trip.  Cole hesitated and said he left on this trip "about four days ago."   He said stopping in Cincinnati was "just because I'm passing by." He said he was

meeting some buddies in Colorado because one of them was getting a divorce.

Cole said he had the car for about six months, but "he just got the paperwork transferred."  He was driving it on his "buddy's paperwork," but had just purchased the car and got the registration and insurance.  Cole said his girlfriend registered the car for him.  He did not register the Vehicle in person.  Cole said he spent most of his time in "LA."  Cole stated that he had a child in "LA" and a child in Florida.  He said he planned to move to Florida in the near future.

Trooper Chapman summarized the information:

So, you've got an Arizona driver's license that says Tucson . . . I'm just trying to get this clear, . . . and you said you've been traveling from Maryland, so have you been staying recently in Maryland?

Cole said yes, he had family in Maryland and his boss was in Maryland. He said he stayed with his uncle in Maryland. Cole said that he has not been in Arizona in a long time.  Trooper Chapman again summarized, "So you, your primary address or your permanent address is in California, but recently you've been staying in Maryland."  Cole said, "Yes, because I am a chef, I travel."  Trooper Chapman asked why he did not fly.  Cole said he drove because he had a car.  He said he sometimes traveled with pots and he sometimes took a bicycle with him.

Trooper Chapman testified that he believed Cole's story of his trip was vague and made up. Cole could not remember the place he went to in Colorado. Trooper Chapman considered Cole's reference to "the Springs" to be vague. Trooper Chapman testified that Cole also delayed answering, shifted in his seat, and stated "um" before giving his answers. The recording confirms that Cole hesitated sometimes in answering and said "um" sometimes before answering. Based on Trooper Chapman's training and his years of experience, including a January 2018 training class, he knew these behaviors indicated that Cole was being deceptive in his response. T. 56-57.

At 10:16 on the recording, Trooper Chapman told Cole that he would give him a written warning. Trooper Chapman, however, decided to move the location of the stop from the shoulder of I-72, I-55, to a gas station located next to the closest exit east of the stop location. Trooper Chapman told Cole it would be safer off the shoulder of the freeway. Cole said he wanted to get on his way and that, "If I have to, I will." Trooper Chapman told Cole it would take about 15 minutes to write up the warning. T. 30-33, 44. Cole said he got nervous when he gets pulled over sometimes.

At this point, Trooper Chapman suspected that Cole was involved in drug trafficking and wanted a drug-sniffing dog to conduct a free air sniff

around the Vehicle.  See also T. 72-73.  Trooper Chapman did not want to
conduct the free air sniff on the shoulder of the busy Interstate.  Trooper
Chapman testified that Cole was not free to go at that point.  Trooper
Chapman later testified that Cole was not free to go because the traffic stop
was not yet complete.  T. 45, 48-49, 80-81, 88.

At approximately 11:19, Cole exited the Squad Car and walked back
to the Vehicle.  At 11:37, Trooper Chapman pulled the Squad Car into
traffic to drive to the gas station.  While driving to the gas station, Trooper
Chapman radioed to get a K-9 Unit to come to the stop at the gas station to
conduct a free air sniff around the Vehicle.  He had Dispatch contact
several law enforcement agencies, including Springfield Police Department,
Sangamon County Sheriff's Department, and the Chatham, Illinois, Police
Department, but none had a K-9 Unit available.

At 15:00 on the recording, the Squad Car and the Vehicle arrived at
the gas station.  Trooper Chapman parked the Squad Car so that it was
facing the front of the Vehicle nose-to-nose.  At 15:50 on the recording,
Trooper Chapman called into Dispatch with Cole's name and identifying
information from his driver's license for a background check.  At 16:53,
while Trooper Chapman was waiting for a response from Dispatch, Cole

exited the Vehicle and walked to the driver's side of the Squad Car.
Trooper Chapman told Cole to have a seat in the Squad Car.

Once Cole sat in the Squad Car, Trooper Chapman again told Cole
that he was only going to give him a warning.  At 17:45, Trooper Chapman
asked Cole to tell him more about his trip.  Cole said he met up with some
buddies in Glenwood Springs, Colorado.  At approximately 18:30, Trooper
Chapman asked Cole to get the proof of insurance out of the Vehicle.  Cole
left the Squad Car and went to the Vehicle to get the proof of insurance.

While Cole was out of the Squad Car, Dispatch gave Trooper
Chapman information on Cole's criminal history.  While Dispatch was giving
Trooper Cole the information, Cole came back to the Squad Car and asked
if he could use the bathroom.  Trooper Chapman said yes.  Cole left the
view of the camera to go to the gas station bathroom.  See also T. 85.
Dispatch told Trooper Chapman that Cole had three arrests for drug
trafficking charges in three different states, Arizona, New Jersey, and a
third state.  One charge included possession and use of a weapon in a
drug offense.  Cole was also charged with money laundering in connection
with one of these arrests.  See also T. 85-86.

At 20:51, Trooper Chapman answered a telephone call and talked to
an unidentified law enforcement officer about Cole while Cole was still out

of the car going to the restroom.  Trooper Chapman told the person that Cole was a smuggler.  Trooper Chapman mentioned the criminal history and the story about traveling back and forth from Maryland to Colorado but having an Arizona driver's license and an address in California.  Trooper Chapman said he would call "Kevin" to see if he could bring a K-9 Unit. Trooper Chapman commented that the Vehicle was a Volkswagen.  He said that "they were good for exhaust tunnels."  Trooper Chapman commented that Cole was nervous.  Trooper Chapman also commented that traveling from Maryland to Colorado would take two days one-way. Chapman opined in the telephone call that Cole would not give consent to search.

At approximately 22:50, Trooper Chapman hung up on the call and asked Dispatch to check "Pawnee" for a K-9 Unit.  Trooper Chapman testified that he thought of the town of Pawnee, Sangamon County, Illinois, because the State Police K-9 training facility was in Pawnee.  T. 45-46, 62. At 23:15, Cole walked back in front of the Squad Car.  Cole stood outside between the two vehicles while Trooper Chapman was talking to Dispatch. At 24:20, Dispatch told Trooper Chapman that the Pawnee K-9 Unit was enroute.  At 24:38, Cole got back into the Squad Car.

Trooper Chapman asked Cole about the insurance. Cole said his girlfriend got the insurance for him. He said he had been driving with his buddy's license plates and insurance. At 25:36, Cole said he had the car for "nine months – eight, six to nine months." Trooper Chapman testified that he observed Cole with the car passenger side door ajar and his right leg remaining outside the car. Trooper Chapman testified that from his experience and discussions with other officers, he believed Cole engaged in this behavior at least subconsciously to leave himself an escape route. T. 49, 53-54.

At approximately 27:55, the recording includes sounds of Trooper Chapman typing. He was apparently typing up the warning. Trooper Chapman asked what day Cole left Maryland. Cole said he left Maryland about five days before. Cole said he stayed in Colorado two days. At 30:13, Trooper Chapman asked Cole for his current address to complete the warning. Cole gave an address in Los Angeles that was different from the address on the Vehicle's registration. Cole said his girlfriend used her family's address on the registration.

At approximately 33:08, Trooper Chapman told Cole he was issuing a written warning, but that he believed Cole was involved in some criminal activity. Trooper Chapman told Cole that he had a K-9 Unit coming.

Trooper Chapman and Cole waited for the K-9 Unit.  Trooper Chapman and Cole talked more about the trip.  Cole said he stayed at a friend's place when he stopped in Cincinnati.  Cole said he spent one night in Cincinnati to visit with a buddy in Cincinnati.

At Trooper Chapman's request, Cole checked the mileage on the Vehicle.  The mileage was 124,562. This was approximately 2,000 miles more than the reading on June 4, 2018 when the Vehicle was sold and registered in California to Cole.  T. 70.  Trooper Chapman asked Cole where he lived in Maryland.  Trooper Chapman testified that he checked Google Maps to get the driving distance from Cole's address in Maryland to Glenwood Springs, Colorado.  At 39:55, Trooper Chapman told Cole that the distance from Cole's address in Maryland to Colorado was 1,815 miles and would take 27 hours non-stop to drive the distance.  See T. 71, 92. Trooper Chapman asked Cole again whether he left Maryland five days ago.  Cole said he was not good with dates.  He said he left Colorado yesterday.  He said he met with his buddies in Colorado to have a party.

At 42:50, the K-9 Unit arrived.  The K-9 Unit was a State Police K-9 Unit.  While the dog was walking around the car Cole admitted that he had been nervous "since the minute" Trooper Chapman pulled him over.  Cole stated that his hands were "really sweating."  Trooper Chapman said Cole

became increasingly nervous throughout the entire stop even though he knew he was only getting a written warning. Cole said he understood that. See also T. 71-72, 89-90. Cole also said he was responsible for everything in the Vehicle. The dog completed the free air sniff at approximately 45:25. The K-9 Unit officer put the dog back into the K-9 Unit. At approximately 46:20, the K-9 Unit Officer told Trooper Chapman that the dog "hit" or alerted on the Vehicle. Trooper Chapman and the K-9 officer subsequently searched the Vehicle and found the illegal drugs that form the basis of the charge in this case.[3] T. 91.

## ANALYSIS

Cole moves to suppress the drugs and any other evidence found at the June 25, 2018 search of the Vehicle and any post-arrest statements. Cole argues that the search violated his Fourth Amendment rights to be free from unreasonable searches and seizures because Trooper Chapman did not have probable cause to stop Cole, Trooper Chapman unreasonably delayed and extended the stop past the time necessary to complete the traffic stop, and Trooper Chapman did not have reasonable suspicion

---

[3] Trooper Chapman also testified that he radioed the Team to see if any license plate readers across the country had taken a picture of the Vehicle's plate. Trooper Chapman understood that the Team had been participating in a program to try to collect license plate pictures. He wanted to see if a picture existed that showed the Vehicle traveled through a location that was inconsistent with Cole's story. T. 60. The Team no longer had access to the license plate reader program. T. 61. The Court could not ascertain from the recording when Trooper Chapman had these communications with the Team.

based on articulable facts that Cole was engaged in criminal activity necessary to justify detaining Cole past the time needed to complete the traffic stop.

An officer may stop a vehicle if he has probable cause to believe the driver of the vehicle is committing a traffic violation.  The officer further may conduct a free-air sniff around the vehicle by a trained drug-sniffing dog during the course of the traffic stop.  Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The officer, however, may not detain the vehicle and its occupants longer than would be reasonably necessary to complete a traffic stop in order to conduct the free-air sniff, unless the officer has some other basis for detaining the vehicle.  Rodriguez v. United States, __ U.S. __, 135 S.Ct. 1609, 1612 (2015).  An additional valid basis to detain the vehicle beyond the time necessary to conduct a traffic stop exists if the officer has reasonable suspicion of criminal activity, such as possession of illegal drugs.  Id. at 1616; see United States v. Guidry, 817 F.3d 997, 1005 (7th Cir. 2016).

An officer may also detain a vehicle and its occupants if he has probable cause that the occupants are carrying illegal drugs.  An officer with such probable cause may search the vehicle.  Caballes, 543 U.S. at 407.  A properly trained drug sniffing dog's positive alert on a vehicle

provides probable cause to search a vehicle.  See Guidry, 817 F.3d at 1005.

The Court finds that Trooper Chapman had probable cause to stop Cole for following too closely behind the Merging Vehicle.  Probable cause exists when a reasonable officer under the totality of the circumstances would believe that the driver committed a traffic violation.  United States v. Lewis, 920 F.3d 483, 486 (7th Cir. 2019).  Following more closely behind a vehicle than is reasonable and prudent under the circumstances is a violation of the Illinois Vehicle Code.  625 ILCS 5/11-710.  The recording showed the Squad Car merge behind the Black SUV, but then immediately pulled back into the left lane of I-72.  The recording showed that when the Squad Car moved back into the left lane, Cole was following closely behind the Merging Vehicle.  This portion of the recording establishes that a reasonable officer under these circumstances could reasonably believe that Cole was following too closely behind the Merging Vehicle in violation of 625 ILCS 5/11-710.  Trooper Chapman had probable cause to stop Cole.  Cole's testimony to the contrary is not credible.

Trooper Chapman also had reasonable suspicion to detain Cole beyond the time reasonably necessary to complete the traffic stop.

Reasonable suspicion is "something less than probable cause but more than a hunch." United States v. Baskin, 401 F.3d 788, 791 (7th Cir. 2005).

> Reasonable suspicion requires " 'specific and articulable facts which, taken together with rational inferences from those facts,' suggest criminal activity." United States v. Ruiz, 785 F.3d 1134, 1141 (7th Cir. 2015 (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)). Reasonable suspicion is an objective standard, considering the totality of the circumstances.

Lewis, 920 F3d at 493. Reasonable suspicion is not an onerous standard:

> Reasonable suspicion requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause to effect an arrest. United States v. Esquivel–Rios, 725 F.3d 1231, 1236 (10th Cir. 2013). "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity." Id. (quoting Poolaw v. Marcantel, 565 F.3d 721, 736 (10th Cir. 2009)). Indeed, we have held that factors consistent with innocent travel may contribute to reasonable suspicion. United States v. Valles, 292 F.3d 678, 680 (10th Cir. 2002). As long as an officer has "a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is not involved in any illegality." United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004).

United States v. Petit, 785 F.3d 1374, 1379-80 ((10th Cir. 2015) (emphasis in the original) (cited with approval in United States v. Sanford, 806 F.3d 954, 959 (7th Cir. 2015)).

In light of these principles, Trooper Chapman had reasonable suspicion based on articulable fact to detain Cole when Trooper Chapman

told Cole he was moving the traffic stop from the side of I-72 I-55 to the gas

station at 10:16 into the recording, or less than 10 minutes into the traffic

stop and clearly within the time reasonably needed to complete the traffic

stop.  By that time Trooper Chapman knew:  (1) the Vehicle was registered

to Cole only 21 days earlier and was insured only five days earlier,

consistent with methods used by drug traffickers to avoid establishing a

connection between a vehicle and a specific person; (2) the Vehicle was

registered in Los Angeles, California, a known origin of illegal drug

trafficking; (3) the Vehicle was a Volkswagen which could be equipped with

hidden compartments to hold drugs; (4) Cole drove unusually slowly; (5)

Cole extended his arms and tried to hide behind the pillar behind the

driver's seat  when he passed Trooper Chapman's Squad Car; (6) Cole

was extremely nervous when Trooper Chapman stopped him and remained

nervous throughout the traffic stop (Cole admitted his nervousness on the

recording several times during the stop); (7) Cole gave a vague explanation

for why he had an Arizona driver's license, a car registered in California,

and lived in Maryland; (8) Cole told a vague and improbable story that in

only four or five days he was able to drive: (a) from Maryland to Cincinnati,

Ohio "for a couple of days, work related," (b) then to "the Springs" in

Colorado to hook up with family, (c) then to a location outside Boulder,

Colorado to see a friend, and (d) then to Springfield, Illinois on his way back to Maryland; (9) Cole changed the story from staying in Cincinnati for a "couple of days, work related," to stopping in Cincinnati "just because I'm passing by;" (10) Cole also changed the story from meeting "family" at "the Springs" to meeting "family and friends," and then to meeting up with some buddies because one of the guys was getting a divorce; and (11) Cole hesitated, said "um" repeatedly, and shifted in his seat while answering questions.  All of these factors either were consistent with drug trafficking or indicated that Cole was nervous and lying.  Together, these factors constituted articulable facts that supported Trooper Chapman's reasonable suspicion that Cole was engaged in criminal activity.

Trooper Chapman, therefore, had a proper basis to detain Cole on reasonable suspicion for the additional approximately 35 minutes until the K-9 Unit arrived and the trained drug sniffing dog alerted on the Vehicle.  At that point, Trooper Chapman had probable cause to search the Vehicle. The search, therefore, was valid.  Because the search was valid, the drugs found in the Vehicle should not be suppressed and Cole's subsequent statements should not be suppressed.

THEREFORE, THIS COURT RECOMMENDS that Defendant Janhoi Cole's Amended Motion to Suppress Evidence (d/e 24) should be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   July 22, 2019


_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE